UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| United States of America | § § | |
| v. | § § | No. SA-22-CR-653-OLG-1 |
| Christopher John Pettit<br>Defendant. | § § § | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America asks the Court to impose a sentence at the top of the Guideline range of nearly 25 years of imprisonment during the sentencing of Christopher John Pettit on February 21, 2024. The United States asks the Court to run at least two of Pettit's counts of conviction consecutive to achieve the top-end range sentence, given that the statutory maximum for one count of wire fraud is capped at 20 years. Imposing a sentence of more than 20 years is necessary to account for the harm Pettit wrought on the community and on his victims.

I. **Background**

In December 2022, a federal grand jury in San Antonio indicted Pettit on five counts of wire fraud and three counts of money laundering for Pettit's actions in operating his San-Antonio-based law practice as a Ponzi-type scheme. As described in the indictment, Pettit promised to provide financial and legal services to his clients, often assuring them that he would hold and manage large sums of his clients' money to provide safe investment opportunities or to limit their tax liabilities. Instead of keeping his promises and performing the services, Pettit betrayed his clients, took their money, and spent it on his own high-end lifestyle or used it to payoff other clients to keep his scheme hidden. Pettit pleaded guilty to three of the five wire fraud counts and all the money laundering counts pursuant to a plea agreement in October 2023.

The Probation Office issued its Presentence Investigation Report, which calculated Pettit's Guideline range at 235-293 months' imprisonment, which range includes the agreement between Pettit and the United States that his Guideline loss calculation should not exceed $65 million and that he should receive credit for acceptance of responsibility.

Following a motion from the United States, the Court bifurcated sentencing in this case, allowing the United States additional time to prepare for the restitution portion of sentencing to be held at a later date, during which the Court will determine how to apportion restitution to Pettit's victims. ECF No. 54. On February 21, the Court will determine how to punish Pettit.

II. **Legal Standard**

The "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" because the Guidelines form the "starting point and the initial benchmark" for crafting an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Court is required to "make an individualized assessment based on the facts presented" and "may not presume that the Guideline sentence is reasonable." *Id.* at 49-50. In so doing, the Court must consider all the § 3353(a) factors to fashion an appropriate sentence. *Id.*

III. **The Court Should Adopt the Findings in the PSR**

The United States asks the Court to adopt the factual findings and recommendations in the PSR, as revised on February 15, 2024. ECF No. 55. The PSR provided sufficient factual detail and indicia of reliability for the Court to find that the facts asserted in the PSR are accurate. *See United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) ("Generally, a PSR bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations") (citation and quotations omitted).

In this case, the PSR chronicled Pettit's criminal conduct in even greater detail than the indictment and plea agreement, adding specifics from the FBI's numerous reports, the testimony at Pettit's detention hearing (during which testimony was subject to cross-examination), and statements from victims. PSR ¶ ¶ 11, 35, 38. Furthermore, the Probation Office revised sections of the PSR in response to factual objections made by Pettit, indicating that Pettit accepted the remaining unobjected-to factual descriptions.

As to Pettit's unresolved objections to the PSR, and to any he should raise at sentencing, it is the defendant's burden to present "rebuttal evidence showing that those facts are materially untrue, inaccurate, or unreliable." *United States v. Hawkins*, 866 F.3d 344, 347 (5th Cir. 2017) (citations omitted). Mere arguments or assertions by defense counsel that the PSR was inaccurate are insufficient—the defendant has the burden to present testimony, records, or other evidence to refute the assertions in the PSR whenever the PSR contains sufficient indicia of reliability. *Id.*

The PSR calculated the seriousness of Pettit's offenses consistent with the Guidelines, using facts supported by law enforcement's reports, and by the testimony provided in other proceedings. For example, Pettit merited a two-point increase by providing misleading and fraudulent representations in bankruptcy. PSR ¶ 48 (citing § 2B1.1(b)(9)(B)). He violated the "golden rule" of bankruptcy by failing to disclose "numerous assets," including a $100,000 Mercedes Benz even while he was with his bankruptcy trustee touring a storage facility containing the vehicle. **Gov. Ex. A**, Detention Hr'g Tr. 12, ECF No. 43 (quoting the trustee).

Similarly, Pettit received an additional two-point increase for his attempts to hide assets and potential witnesses. PSR ¶¶ 40, 52. Pettit asked his nanny's family to lie to hide that they were acting at Pettit's direction after he instructed them to sell assets outside the bankruptcy proceedings. Detention Hr'g Tr. 18-19. He also tried to get other members of the nanny's family

3

to avoid being called as witnesses by staying in Mexico, rather than returning to San Antonio. *Id.* 17-18. Pettit's efforts inhibited the bankruptcy process, but also had the ability to hinder the criminal investigation, which had an interest in identifying Pettit's assets and used information from other proceedings to inform the criminal investigation.

## IV.     Consecutive Sentences Necessary for Adequate Punishment

The United States asks the Court to impose a sentence at the top of the Guideline range, nearly 25 years, to punish Pettit for his crimes. Since the statutory maximum for the highest count of conviction, wire fraud, is 20 years, the Court must order at least two of Pettit's counts of conviction to run consecutively to reach the high-end of the Guideline range. *See* U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively"). For the Court to run sentences consecutively in this case, the Court must specifically order that the sentences run consecutive, which it must do after weighing the same § 3553(a) factors used to determine an appropriate sentence. 18 U.S.C. § 3584(a)-(b).

## V.      The Impact on Victims

While the Guidelines calculated Pettit's sentencing range at 235-293 months, other intangible and unquantifiable factors require a sentence at the top of the range. The Court must consider the nature and circumstance of Pettit's crimes, the seriousness of the offense, the need to deter others, and to punish Pettit, which factors are most clearly illustrated by the serious impact of Pettit's crimes on his victims. In addition to the victims who may provide written statements to the Court or who may provide statements at the sentencing hearing itself, the United States asks the Court to consider statements provided by victims to the FBI during the investigation. The United States will file these exhibits redacted and under seal, which are summarized below.

**Gov. SEALED Ex. A:** Victim A came into a windfall, which he spent on his family, building a set of houses on his land so that that they could all stay together and be financially secure in their homes. He took the left-over money from his windfall and invested it with Pettit. Pettit provided him with financial statements purporting to show that Pettit had invested the money in bonds as promised. These statements were fraudulent. Pettit had not invested the money in bonds. But since Victim A was receiving statements and Pettit continued to prepare his taxes for him without incident, Victim A referred his wife's uncle and his brother-in-law to Pettit. All three claimed to be victims of Pettit's scheme.

**Gov. SEALED Ex. B:** Victim B's wife was sick in a hospital. He was looking for an attorney to update their wills when he met Pettit. He hired Pettit to update their wills, create a family trust, and then Pettit convinced him to use Pettit's services to invest in bonds, which Pettit promised him were fully insured. Pettit provided letters confirming the investment, but Victim B so trusted Pettit that he never even signed an investment agreement. When Victim B's son died suddenly, Victim B once again trusted Pettit. Pettit promised to place the son's death benefit in a principal protected investment. Victim B's wife also passed away. Victim B stated that because of Pettit's fraud, he now has none of the money he invested with Pettit.

**Gov. SEALED Ex. C:** Victims C's family, including three generations, trusted Pettit and invested with him for over 30 years. In fact, Pettit created a trust for Victim C's grandparents, her parents, and for her. According to Victim C, her father and Pettit had a father-son-type relationship and her father regularly referred people to Pettit. Before her mother passed away, her mother asked Pettit to look out for her. Instead, Victim C only learned of Pettit's scheme when she was trying to buy a house and Pettit did not transfer the funds to her account to complete the purchase. She then read stories in the newspapers, which had begun to describe Pettit's frauds.

She realized that, even as Pettit's scheme was collapsing around him and he was reaching civil settlements with other victims in March 2022, Pettit was still accepting hundreds of thousands from her and issuing false statements purporting to show she had over a million dollars invested with him. Victim C said that she lost all her money with Pettit.

### VI. Conclusion

The United States asks the Court to impose a sentence at the top of the Guideline range of nearly 25 years to sufficiently punish Pettit for his crimes. To do so, the Court must order at least two of Pettit's counts of conviction to run consecutively. The § 3553(a) factors compel such a serious sentence to account for the particular circumstances and seriousness of Pettit's crimes, which caused incalculable and irreparable harms to his victims.

Respectfully submitted,

Jaime Esparza
United States Attorney

_____

Kelly G. Stephenson
Assistant United States Attorney
Texas Bar # 24079823
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7100

## CERTIFICATE OF SERVICE

    I certify that I caused a true and correct copy of the foregoing instrument to be electronically filed with the Clerk of the Court using the CM/ECF System, which will transmit notification of such filing to counsel of record for the Defendant.

                                              _____*S*_____
                                              Kelly Stephenson
                                              Assistant United States Attorney