Government's Exhibit A

United States' Sentencing Memorandum

Christopher John Pettit

SA-22-CR-653-OLG-1

```
1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS

3                      SAN ANTONIO DIVISION

4   UNITED STATES OF AMERICA,   § CRIMINAL NO. 5:22-00653-OLG
                                §
5                               §
    v.                          § December 13, 2022
6                               §
    CHRISTOPHER PETTIT,         §
7                               §
    DEFENDANT.                  §
8

9


10          REDACTED TRANSCRIPT OF DETENTION HEARING
          BEFORE THE HONORABLE ELIZABETH CHESTNEY
11                 MAGISTRATE COURT JUDGE

12   APPEARANCES:

13   For the Government:     ROBERT ALMONTE, AUSA
                            KELLY GRIFFITH STEPHENSON
14                          Office of US Attorney
                            601 NW Loop 410, Suite 600
15                          San Antonio, Texas 78216

16
     For the Defendant:     MATTHEW T. ALLEN
17                          Law Office of Matthew Allen
                            310 S. St. Mary's St. #965
18                          San Antonio, TX 78205

19                          RON SMEBERG, Bankruptcy Attorney

20

21

22

23

24
     FTR AUDIO RECORDING produced by mechanical stenography;
25   computer-aided transcription
```

2

```
1                              INDEX

2                    DIRECT  CROSS  REDIRECT  RE-CROSS

3   GOVERNMENT WITNESS:

4   ERICK TERRY              6      21

5   THOMAS SWEAT        32      49

6   DEFENDANT'S PROFFER:

7   BY MR. SMEBERG        58

8   ARGUMENT BY MR. ALMONTE      62

9   ARGUMENT BY MR. ALLEN        67

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (In open court.)

2              THE COURT SECURITY OFFICER:  All rise.

3              THE COURT:  You may be seated.

4              THE DEPUTY CLERK:  United States of America v.

5    Christopher Pettit.  SA:22-CR-653.

6              THE COURT:  Good morning.  Appearances, please?

7              MR. ALMONTE:  Good morning, Your Honor.  Robert

8    Almonte and Kelly Stephenson for the United States.  We're

9    ready.

10             MR. ALLEN:  Matthew Allen.  And Ron Smeberg is

11   Mr. Pettit's bankruptcy attorney.  He's here as well, Your

12   Honor.

13             THE COURT:  Okay.  Thank you.  And we're proceeding

14   on both the arraignment and detention hearing today?

15             MR. ALLEN:  Correct, Your Honor.

16             THE COURT:  Okay.  And any doubt as to your

17   client's competence?

18             MR. ALLEN:  No, Your Honor.

19             THE COURT:  All right.  Ms. Sandoval, will you

20   swear in the defendant, please?

21             THE DEPUTY CLERK:  Yes, Your Honor.  If could

22   remain seated and raise your right hand, please.

23             Do you swear or affirm that the testimony which you

24   may give to the Court in this case now shall be the truth,

25   the whole truth, and nothing but the truth?

```
 1              DEFENDANT PETTIT:  Yes, ma'am.
 2              THE COURT:  Mr. Pettit, and anything interfering
 3    with your ability to understand me today?  Any medical or
 4    mental health issues, medicines, drugs, alcohol?
 5              DEFENDANT PETTIT:  No, Ma'am.
 6              THE COURT:  Okay.  And you've been given a copy of
 7    the indictment filed in your case?
 8              DEFENDANT PETTIT:  Yes, Ma'am.
 9              THE COURT:  And you've had a chance to go over it
10    with your attorney?
11              DEFENDANT PETTIT:  I have.
12              THE COURT:  Okay.  And does your client waive my
13    reading that again, Mr. Allen?
14              MR. ALLEN:  Yes, Your Honor.
15              THE COURT:  Okay.  And would you like to enter a
16    plea on behalf of your client?
17              MR. ALLEN:  Not guilty, Your Honor.
18              THE COURT:  A plea of not guilty will be entered,
19    and the case will be forwarded on to the district court for
20    further proceedings.  And, Mr. Almonte, just remind the
21    government of your disclosure obligations under Brady v.
22    Maryland and its progeny.  The failure to comply with those
23    obligations and this Court's order can result in multiple
24    consequences including being held in contempt, evidence being
25    suppressed, the case being delayed, or even charges being
```

1    dismissed.

2            MR. ALMONTE:  Yes, Your Honor.

3            THE COURT:  Okay.  All right.  So we'll be

4    proceeding on the detention hearing.  I do have the

5    indictment, of course.  I'll take judicial notice of the fact

6    that the grand jury has found probable cause on these charged

7    offenses.

8            I also have the pretrial services report.  And I'll

9    start by asking if you have any -- well, I guess, first we're

10   going to be calling the witness on the -- to start with.

11           MR. ALMONTE:  Yes, Your Honor.  We'll be -- we

12   intend to call in two witnesses.

13           THE COURT:  Okay.  Let's proceed with your first

14   witness then.

15           MR. ALMONTE:  And Kelly Stephenson will proceed

16   first, Your Honor.

17           THE COURT:  Okay.

18           MR. STEPHENSON:  Thank you, Your Honor.  The

19   government will call Erick Terry.

20           THE DEPUTY CLERK:  If you can raise your right

21   hand.

22           Do you swear or affirm that the testimony which you

23   may give to the Court, in this case now, shall be the truth,

24   the whole truth, and nothing but the truth?

25           THE WITNESS:  Yes, I do.

ERICK TERRY - DIRECT

1         THE DEPUTY CLERK:  You may be seated.

2         ERICK TERRY, GOVERNMENT WITNESS, SWORN

3                 DIRECT EXAMINATION

4  BY MR. STEPHENSON:

5  Q    Good morning, Mr. Terry.

6  A    Good morning.

7  Q    Would you please provide your full name for the record?

8  A    Erick Terry.

9  Q    And how are you employed?

10  A    I'm a business bankruptcy attorney.

11  Q    And what is your relationship to Mr. Pettit?

12  A    I'm appointed as the Chapter 11 trustee.  I was

13  appointed on June the 16th.

14  Q    And can you give me a little bit of your background as

15  a bankruptcy trustee and qualifications?

16  A    Sure.  I've been a bankruptcy -- business bankruptcy

17  attorney for 27 years, and I started doing trustee work in

18  2020.  I've been appointed to over 20 sub-chapter five,

19  Chapter 11 cases as a sub-chapter five trustee.  I've also

20  been a Chapter Seven trustee, and I'm now an appointed

21  Chapter 11 trustee in Mr. Pettit's case and also his PC

22  case.

23  Q    And you were mentioning Chapter Five, Chapter Seven,

24  Chapter 11.  For those of us who aren't that familiar with

25  bankruptcy, can you give me a high-level overview of the

ERICK TERRY - DIRECT

1   bankruptcy -- the purpose of the bankruptcy proceeding?

2   A    Sure.  Generally speaking, bankruptcy proceedings

3   especially in this context, the liquidation context, the

4   primary purpose is to assemble and gather assets, maximize

5   the value of those assets and ultimately distribute those

6   assets to creditors.

7   Q    And so what are the benefits to somebody entering

8   bankruptcy, typically?

9   A    For a debtor entering bankruptcy, an honest debtor

10  entering bankruptcy, that debtor can get breathing room

11  through the automatic stay.  There's an injunction in place

12  that prevents collections efforts.  An honest debtor can get

13  a discharge of its debts.  And then, you know, an orderly

14  distribution according to the priority scheme of the

15  bankruptcy.  Go ahead.

16  Q    And as to the bankruptcy proceedings involving

17  Mr. Pettit, who initiated those bankruptcy proceedings?

18  A    Mr. Pettit voluntarily filed his bankruptcy cases.

19  Q    And can you describe for me your role in Mr. Pettit's

20  bankruptcy?

21  A    So I've displaced or stepped into the shoes of

22  Mr. Pettit individually, in his individual estate and also

23  in his PC estate.  Mr. Pettit and his counsel agreed after

24  they voluntarily filed bankruptcy to the appointment of a

25  Chapter 11 trustee.  So my job is not to operate the debtor

ERICK TERRY - DIRECT

1   but it's to liquidate the debtor, to take the command of

2   both of those estates and assemble, acquire the assets,

3   maximize their value.  And, again, ultimately, distribute

4   those assets.

5   Q    And just for my own clarity, the debtor, who are you

6   are referring to in that situation?

7   A    I'm sorry.  There's two debtors here.  There's a debtor

8   individually, Chris Pettit individually.  And then

9   separately but jointly administered, Chris Pettit's and

10  Associates PC is the second debtor.

11  Q    And in your role and  trustee of Mr. Pettit's

12  bankruptcy and that of his legal entity, have you met

13  Mr. Pettit?

14  A    I've met Mr. Pettit in person three or four times, and

15  I've spoken -- and I've seen him in court, obviously, on

16  numerous occasions and by Webex.  And then I've also talked

17  to him over the phone.

18  Q    And have you become familiar with his financial

19  situation, his spending habits, things of that nature?

20  A    Very familiar.

21  Q    Okay.  So I'd like to move you on a little bit to

22  asking if you're aware of any instances where in your

23  capacity as trustee where -- any instances where

24  Mr. Pettit's has failed to appear at a hearing or a --

25  failed to appear in a manner required by a judge in the

ERICK TERRY - DIRECT

1   bankruptcy proceedings?

2   A    So as far as appearance or failure to appear at a

3   hearing, Judge Gargotta, the bankruptcy judge, wasn't

4   ordering Mr. Pettit.  That's just the style he approached it

5   in this case.  He wasn't ordering Mr. Pettit to be in

6   person.  So I don't see a direct violation of an order

7   ordering him to appear in person except for one instance.

8   And  I recall that Mr. Pettit filed a motion to use the

9   state funds with a budget that I believe was something like

10  $40,000 plus a month.  But that's what you do in bankruptcy.

11  You ask for the authority to use money, which Mr. Pettit

12  didn't do initially but he did it this time.  Asked for a

13  hearing.  And at that hearing he didn't even appear.  And so

14  the judge properly said, there's people here including the

15  Court that want to talk about the expenses on the budget, so

16  Mr. Pettit needs to show up in person next week.  Next week

17  comes and Mr. Pettit was by Webex and the judge -- Judge

18  Gargotta said, "I thought I told you to show up in person."

19  And Mr. Pettit and Mr. Colvard made some excuses about him

20  not being able to afford travel.  And so Judge Gargotta

21  being the nice judge he was went on with the hearing.

22  Q    And just for clarification, mister -- you mentioned a

23  Mr. Colvard.  Who was Mr. Colvard?

24  A    I apologize.  Mr -- Mr. Mike Colvard was at the time

25  Mr. Pettit's bankruptcy counsel.

ERICK TERRY - DIRECT

1    Q    Okay.  Let me ask, are you also aware of any instances

2    where Mr. Pettit has shown disregard for a Court's

3    instructions or bankruptcy requirements?

4    A    Several examples.

5    Q    And can you describe some of those for me, maybe start

6    with any involving moving assets within the post-bankruptcy

7    process.

8    A    With regard to moving assets, Mr. Pettit in late August

9    contacted, he called them representatives, but it was the

10   nanny and the nanny's family, his nanny.  And then his

11   family, without naming names.  But he organized them to go

12   to his alleged homestead and collect personal property with

13   the intent to sell that property.

14   Q    And we'll come back to that and get more details on

15   that.

16   A    Okay.

17   Q    Can you talk to me about moving assets between

18   financial accounts or into financial accounts and out and in

19   into others?

20   A    Sure.  So a debtor has the obligation under federal law

21   Title 11, which is the bankruptcy code, to fill out

22   schedules or properly disclose his assets and also to

23   voluntarily surrender assets to the trustee.  And so

24   Mr. Pettit didn't do that properly in the first instance.

25   So immediately upon my appointment I asked for information

ERICK TERRY - DIRECT

1    including information about bank accounts.  And it was

2    discovered in early July that Mr. Pettit was spending an

3    excessive amount of estate money.

4    Q     And where was that account held?

5    A     That account was held at Martha's Vineyard Bank.

6    Q     And, to your knowledge, how was that account funded?

7    How did Mr. Pettit put money into that account?

8    A     He transferred money from his 401K IRA account that was

9    held with Fidelity.

10   Q     And as far as your understanding, the money that was in

11   his 401K and his Fidelity IRA, was that money that was

12   derived from fraudulently attained funds?

13   A     Based on my understanding and my consultation with my

14   forensic accountant, I believe it was.

15   Q     Okay.  And so what was he doing with that money that

16   was in his Martha's Vineyard account?  How was -- how was he

17   utilizing it?

18   A     Spending in all kinds of excessive ways.  He went

19   through --

20   Q     Can you give me an example?

21   A     Yes, sir.  He went through $250,000 from June 1st to

22   July 11, so roughly 45 days.  And he spent that money on

23   Amazon marketplace, hundreds to thousands of dollars.  Video

24   games, hundreds to thousands of dollars, checks to cash, ATM

25   withdrawals, restaurants, hotels, to various consultants he

ERICK TERRY - DIRECT

1  called them, that if you Googled them were basically -- held

2  themselves out as asset protectors.  So just hodgepodge of

3  things.  And, again, within a 45-day period went through

4  $250,000.

5  Q    And you also mentioned that he failed to disclose

6  certain assets.  Can you give me some examples of assets he

7  failed to disclose?

8  A    Numerous assets.  But the big items that stand out were

9  at least three vehicles and at least two storage facilities,

10  oh, and a mobile home.  And these assets would pop up, you

11  know, during the case.  He didn't disclose them.  I had to

12  find them out even after asking him point blank about

13  further vehicles.  Even after visiting a storage facility

14  with Mr. Pettit where a $100,000 Mercedes was stored, he did

15  not tell me about that, and we subsequently found out about

16  it a week later when I got the bill from the bank that held

17  the lien.

18  Q    And -- and I think this is probably obvious, but what

19  is the significance of failing to disclose assets in the

20  context of a bankruptcy proceeding?

21  A    Again, I'm not a criminal lawyer but disclosure is, you

22  know, first and foremost in bankruptcy.  I mean, I've been

23  -- I've been teaching law clerks for 16 years.  And

24  disclosure is the golden rule.  If you don't disclose you

25  don't get the benefits of bankruptcy.  But, more

ERICK TERRY - DIRECT

1    importantly, it's a bankruptcy crime under, you know, Title

2    18.

3    Q    Thank you.  And so let me move on to a little bit

4    different topic in terms of -- are you aware of any actions

5    he has taken to engage in other misuse of client funds, say,

6    immediately before declaring bankruptcy around that time

7    period?

8    A    Yes.

9    Q    Can you describe some of those for me?

10   A    So the clearest example of that was in mid-August.  We

11   finally got the production from Wells Fargo about the

12   several IOLTA accounts that Mr. Pettit had, a Texas IOLTA

13   account, a New Mexico IOLTA account.  And during the May

14   time period, I'm talking about weeks before the June 1st

15   bankruptcy filing, in this example I'm using, it's evident

16   by the account that over a million dollars was transferred

17   into the -- that account from a former client pursuant to

18   what was told to them, maybe a 1031 Exchange and then just

19   spent by Mr. Pettit on various personal expenses and also

20   used to fund his lawyers' retainers in part including a

21   criminal defense attorney and the bankruptcy attorney.

22   Q    And, just to be clear, how proximate was that to filing

23   bankruptcy, approximately?

24   A    Two weeks.

25   Q    Okay.  And you said it was an IOLTA account.  Can you

ERICK TERRY - DIRECT

1  describe what you mean by an IOLTA account?

2  A    Yeah.  IOLTA account is, you know, every lawyer in

3  Texas -- Texas, has a trust account.  And you have to

4  account for that through a ledger and bank reconciliation.

5  And money is put in there or money is held for another,

6  meaning money is held for a client.  It's not the lawyer's

7  money.  And what Mr. Pettit did was he took other people's

8  money and used it for his own benefit.

9  Q    To include paying for attorneys?

10 A    Yes, sir.

11 Q    His own attorneys?

12 A    Yes.

13 Q    And what -- what were the other -- just give me one or

14 two other examples.

15 A    Some of the expenses we've talked about, you know,

16 including just large excessive grocery trips.  You know,

17 fuel for various vehicles.  Then there were a couple of

18 larger payments to at least one piece of real property in

19 New Orleans.  But Mr. Pettit was very good at taking large

20 sums of money and spending it really fast.

21 Q    And thank you for that.  So let me -- let me ask to

22 move on a little bit.  And you had touched on this a little

23 earlier.  Are you aware of any occasions where Mr. Pettit

24 interfered with a witness, a person who might be a witness

25 in the bankruptcy proceedings?

ERICK TERRY - DIRECT

1    A    Yes.

2    Q    And at a very high level, can you give me a description

3    of what that -- what that is and involves?

4    A    It specifically involves his nanny's daughter and I

5    guess their family.  But a specific phone conversation that

6    was recorded where he I believe prepped or tampered with

7    this particular witness's testimony by stating to her

8    directly on the recording that if -- if you testify that I

9    -- I ordered you to sell personal property, I'm going to

10   jail.  But if you testify that you were just trying to help

11   me out, then we're okay.

12   Q    And how did you -- you said it was a recording.  Did --

13   do -- did you receive this recording?

14   A    Yes.  My lawyers and I received this recording directly

15   from the source, the nanny's daughter who we had

16   interviewed.  And when we got done with the interview, she

17   told us that she had a conversation with Mr. Pettit and that

18   she had taped it.  We asked if we could listen to it, and

19   she sent us direct texts.

20          MR. STEPHENSON:  And, Your Honor, with the Court's

21   permission I'd like to play just a few seconds to verify that

22   this is the correct recording and then play about two

23   minutes, if that's all right?

24          THE COURT:  Okay.

25          MR. STEPHENSON:  Ms. Sandoval, could you play about

ERICK TERRY - DIRECT

1   ten seconds of the recording?

2           (Audio recording playing.)

3           MR. STEPHENSON:  That's a good place to stop.

4   Thank you.

5   BY MR. STEPHENSON:

6   Q    Do you recognize the voices on that recording?

7   A    Yes.  That's Mr. Pettit and then the nanny's daughter.

8   Q    Okay.

9           MR. STEPHENSON:  Are there any objections, Your

10  Honor, for me playing the -- about two minutes of that

11  recording?

12          MR. ALLEN:  No, Your Honor.

13          THE COURT:  Go ahead.

14          MR. STEPHENSON:  Okay.  Ms. Sandoval, would you

15  play it?

16          (Audio playing.)

17          MR. STEPHENSON:  Ms. Sandoval, can you please

18  pause?  Thank you.

19  BY MR. STEPHENSON:

20  Q    Just to verify, have you heard that recording before?

21  A    Yes.

22  Q    And that's the same recording you received from the--

23  A    Nanny's daughter.

24  Q    Nanny's daughter?

25  A    Correct.

ERICK TERRY - DIRECT

1    Q    And given your experience and your familiarity with the

2    bankruptcy matter, what do you interpret Mr. Pettit to be

3    saying during that recording?

4              MR. ALLEN:  Objection to speculation.

5              THE COURT:  I'm going to allow it.  Go ahead.

6              THE WITNESS:  My opinion -- my -- based on my

7    experience, is that he was coaching or telling the nanny's

8    daughter, being protective about her name -- the nanny's

9    daughter, what to say.

10   BY MR. STEPHENSON:

11   Q    And -- yeah.  And let me also ask was there -- there

12   was a question about --

13   A    M-hm.

14   Q    There was a comment about who should be -- who should

15   appear at a proceeding.

16   A    Right.  And this was confirmed by the nanny's daughter

17   that that statement was to the nanny's daughter about her

18   father who, confirmed by the nanny's daughter, spends time

19   in Mexico.  And what he was telling her was if he's in

20   Mexico then he should just stay in Mexico and not be

21   available for the hearing.

22   Q    And are you aware of any testimony in subsequent

23   bankruptcy proceedings concerning this recording?

24   A    Yes.

25   Q    And can you summarize for me what you heard in those

ERICK TERRY - DIRECT

1   proceedings?

2   A    That was in the context of I think our second motion

3   for contempt on September 8th, the judge admitted that tape

4   part as well as more of it.  It was confirmed by the nanny's

5   daughter.  And subsequently the judge found that in part the

6   reason for his finding of contempt.

7   Q    And so what did the -- what did the nanny's daughter

8   say during that hearing -- that she was instructed by

9   Mr. Pettit?

10  A    She confirmed -- she stated that Mr. Pettit ordered her

11  and her family to sell the personal property at Champions

12  Run the alleged homestead.

13  Q    And is that contradictory to what we just heard on the

14  recording?

15  A    No, it's consistent.

16  Q    And so -- I'm sorry.  She's saying that -- she said it

17  -- she testified that she was ordered by Mr. Pettit to move

18  items from his homestead--

19  A    Right.

20  Q    -- and sell them.

21  A    Right.

22  Q    In the recording, what did Mr. Pettit say, as you

23  recall?

24  A    I hear what you're saying.  I apologize.  In the

25  recording, Mr. Pettit said that if you testify that I

ERICK TERRY - DIRECT

1   ordered to -- ordered you to sell the property that I'm

2   going to go to jail.  And if you say that -- that --

3          THE COURT:  So she ultimately testified truthfully?

4          THE WITNESS:  Correct.

5          MR. STEPHENSON:  Right.

6   BY MR. STEPHENSON:

7   Q    And so were there any other -- any other members of the

8   nanny's family give testimony at that -- at that bankruptcy

9   proceeding?

10  A    Yeah.  One of the nanny's son's testified and also

11  stated and confirmed that they were told by Mr. Pettit to

12  sell personal property from the alleged homestead residence.

13  Q    Okay.  And so let me ask you -- this -- this recording

14  that we just mentioned was brought up as part of a contempt

15  proceeding, I think you mentioned that.  What was the

16  outcome of that contempt proceeding?

17  A    The judge found Mr. Pettit in contempt and ordered

18  incarceration.

19  Q    As best as you recall, what were the reasons given by

20  the judge for holding Mr. Pettit in contempt?

21  A    It was the finding that he -- about this scheme to move

22  and with the intent to sell his personal property.  There

23  was also the false statements about a business laptop.  And

24  then in his oral findings he went on to say that:  You are

25  disobeying and violating my previous final order that was

ERICK TERRY - DIRECT

1  entered on the previous contempt proceedings by not
2  disclosing all assets because there's new assets popping up
3  and by not properly amending the schedules.
4  Q    Okay.  And do you know how long Mr. Pettit was held in
5  contempt?
6  A    He was incarcerated for three months.
7  Q    Okay.  And was Mr. Pettit given a list of things to do
8  to purge?  This is a civil contempt.  So was he given a list
9  of things to do to purge that contempt?
10 A    Yes.
11 Q    And, to your knowledge, did he do all of the things
12 that were required to purge that contempt?
13 A    I don't believe that he did.
14 Q    Okay.  You've mentioned your experience as a bankruptcy
15 attorney.  How common is this type of scenario?
16 A    It's very uncommon.  I -- I've -- with regard to a
17 bankruptcy judge locking up someone up for contempt, it
18 rarely occurs.  I mean, in my -- in my practice over 27
19 years, I've probably been involved in three or four cases
20 where that's occurred.  And I know of Judge Gargotta.  And,
21 you know, I've heard of other examples.  But he -- he rarely
22 locks people -- debtors up for contempt.
23 Q    And what about something like the witness tampering
24 that we -- that we discussed earlier?
25 A    I've never seen that.

ERICK TERRY - CROSS

```
 1   Q     Never seen it?

 2   A     Not in my practice.

 3   Q     Okay.

 4              MR. STEPHENSON:  Thank you, Your Honor.  No more

 5   questions at the moment.

 6              THE COURT:  All right.  Thank you.  And I will say

 7   it feels like this might be somewhat of a long hearing.  We

 8   may have to break and resume at I think probably 1:30.  So

 9   just giving you a heads up.  You can start your

10   cross-examination though.

11              MR. ALLEN:  Okay.  No problem.  Do you want me to

12   start, Your Honor, or --

13              THE COURT:  You can -- you can start.  I'll give

14   you 15 minutes, and then we'll see if we get through that and

15   then we can take the next witness after lunch.

16              MR. ALLEN:  Okay.  Thank you, Judge.

17                        CROSS-EXAMINATION

18   BY MR. ALLEN:

19   Q    Mr. Berry, you -- you're the trustee on the bankruptcy

20   portion of Mr. Pettit's bankruptcy case?

21   A    Correct.  And it's Mr. Terry.

22   Q    Oh, I'm -- I'm sorry, Terry.  I apologize.

23   A    I probably miscommunicated it.

24   Q    Now, as far as -- you talked about as a trustee you

25   need to work with the debtor.  Is that fair?
```

ERICK TERRY - CROSS

1    A    It is a hindrance if the debtor doesn't follow his

2    obligations to my duties.

3    Q    And so the -- the best case scenario for the -- the

4    bankruptcy -- for any bankruptcy is to -- to work with the

5    debtor, reach an agreement, and have cooperation?

6    A    The best case scenario is full cooperation and honesty

7    by the debtor.

8    Q    Okay.  And as far as -- you talked about one time where

9    Mr. Pettit was ordered to appear but he -- when he was

10   ordered to appear in person, he actually wasn't in court.

11   Is that fair to say?

12   A    Yes.

13   Q    And then he and -- he had an attorney at the time?

14   A    Yes, sir.

15   Q    Okay.  And they were under the understanding I guess

16   that he could come on through Webex?

17   A    That -- that apparently was their understanding.  I'm

18   -- I'm speculating.  I heard it different.

19   Q    And that -- that hearing went forward; is that right?

20   A    Correct.

21   Q    Other than that, there -- there hasn't been any time

22   where he didn't appear in court when he was supposed to be

23   in court?

24   A    That's true.

25   Q    And there -- you recently had a bankruptcy hearing with

ERICK TERRY - CROSS

1    Judge Gargotta?

2    A    Correct.

3    Q    Do you remember -- or recall when that was?

4    A    December 8th, I believe.

5    Q    Okay.  So just last week?

6    A    Right.

7    Q    And you talked about things that weren't disclosed to

8    you right away, things that you had to find out on your own,

9    and other concerns you had.  But you've actually since then,

10   I believe, on December 1st, you've reached an agreement or a

11   settlement and waiver agreement with Mr. Pettit; is that

12   right?

13   A    Yes.

14   Q    And in there it -- it gives things and conditions that

15   Mr. Pettit must follow?

16   A    Correct.

17   Q    And one of those is to -- to meet with the trustee or

18   representatives either to -- to meet with the trustee or

19   representatives, right?

20   A    Correct.

21   Q    To cooperate with the trustee, to implement and effect

22   that agreement?

23   A    Correct.

24   Q    And, again, this was on December 1st; is that right?

25   A    When we entered into the agreement subject to the

ERICK TERRY - CROSS

1    Court's approval?

2    Q    Yes.

3    A    Probably.  That's probably true.  But it was approved I

4    believe on the 8th.

5    Q    Okay.  So is it fair to say that Mr. Pettit hasn't had

6    really an opportunity to -- to try to follow through with

7    the agreement, since he's been in custody since that time.

8    Is that fair?

9    A    With that agreement?

10   Q    Correct.

11   A    Yes.

12   Q    Okay.

13   A    But for six months he didn't cooperate.

14   Q    And so at that hearing on December 8th, pursuant to

15   this agreement by yourself and Mr. Pettit and his attorney,

16   Judge Gargotta lifted that contempt or -- or was going to

17   release Mr. Pettit?

18   A    He released Mr. Pettit based on his reasoning, a

19   balancing of a punitive nature versus the -- whether there

20   would be some utility.  And he did a balancing, and he did

21   release him.

22   Q    Okay.  So as -- as far as the bankruptcy, he's been

23   released.  Is that fair to say?

24   A    Correct.

25   Q    Now, at that --

ERICK TERRY - CROSS

1          THE COURT:  Just to clarify what you're saying, is

2     he was evaluating the contumacious behavior and was deciding

3     whether or not a longer period of incarceration would get to

4     compliance or not and ultimately decided it wouldn't.

5          THE WITNESS:  Correct.

6     BY MR. ALLEN:

7     Q    And -- and, actually, your -- yourself and through the

8     bankruptcy attorneys and Judge Gargotta stated that it would

9     be better and possibly help the bankruptcy if Mr. Pettit was

10    released.  He can help decide which creditors are true

11    creditors, are not true creditors, can meet with the

12    bankruptcy attorneys or yourself.  Is that fair to say?

13    A    It is with qualification because he did it very

14    reluctantly and suspiciously.  He said in theory that makes

15    sense--

16          MR. ALLEN:  I'm going to object to non-responsive.

17          THE WITNESS:  -- but if there's --

18          THE COURT:  I'm going to allow it.

19          THE WITNESS:  His findings speak for themself.  I

20    mean, the judge was saying I'm balancing this.  At this time

21    I'm going to release him, but it won't take me five seconds

22    to put him back if there's no cooperation.

23    BY MR. ALLEN:

24    Q    So -- so -- again, he put Mr. Pettit on notice if -- if

25    he goes through and follows this agreement that you've

ERICK TERRY - CROSS

1  reached then he can remain out.  But if he missteps one time

2  he knows that that -- that contempt can come right back.  Is

3  that fair?

4  A    Yes.

5  Q    And, again, this order that -- that was agreed upon by

6  yourself and signed off by the judge, there's been no

7  violation of that order as to date?

8  A    I -- well, they -- it's --

9  Q    And I --

10 A    That's -- I mean, he hasn't -- it's being violated

11 right now because there's things that he hasn't done.

12 Q    And -- but he's been in custody since then when that --

13 A    That's true.

14 Q    Okay.  Have you tried to set up a visit with

15 Mr. Pettit?

16 A    No.

17 Q    Okay.  Now, you talked -- who was Mr. Pettit's attorney

18 during the time with the Webex, and he didn't show up to

19 that court, do you --

20 A    Michael Colvard.

21 Q    Okay.  And now the attorney is Mr. Ron Smeberg; is that

22 right?

23 A    Correct.

24 Q    You've met Mr. Smeberg?

25 A    I know Mr. Smeberg.

ERICK TERRY - CROSS

1    Q    Okay.  And he's here in the courtroom?

2    A    Yes, sir.

3    Q    Would you agree that the cases may be taking a turn for

4    the better since Mr. Smeberg has come onto the case?

5    A    We got a good result with the settlement.  And

6    Mr. Smeberg had, you know, has been engaged during that time

7    frame.

8    Q    And a -- a good result.  So, in that hearing in

9    December, Mr. Pettit has agreed to voluntarily give up his

10   homestead; is that right?

11   A    He's waived his homestead exemption.

12   Q    Okay.  And you said, "Waived his homestead exemption."

13   What does that mean?  The homestead exemption?

14   A    Well, in -- in Texas because we're in Texas, this

15   federal bankruptcy court would look at exemptions meaning

16   property that would fall out of the estate.  And what I said

17   before was my job is to gather all the estate property and

18   ultimately liquidate it.  In Texas bankruptcy court you get

19   to claim certain exemptions, one of them is a homestead

20   exemption if -- if you prove the requisite elements then

21   that homestead exemption falls out of the estate.

22   Q    And here, again, Mr. Pettit agreed to voluntarily give

23   up that -- that homestead exemption; is that right?

24   A    Correct.

25   Q    And then he also voluntarily gave up his retirement

ERICK TERRY - CROSS

1    account; is that right?

2    A    Correct.

3    Q    Could that fall under an exemption?

4    A    Yes.

5    Q    With those assets that -- that Mr. Pettit gave up, do

6    you know approximately the value of the assets?

7    A    A little over $400,000 in the IRA/401K subject to tax

8    penalties because his withdrawals earlier he wasn't paying

9    taxes on.  So it's probably a little less than that.  The

10   homestead exemption, the equity in the house it's cross

11   collateralized with another building but I think it's

12   significant.  I think it's probably, again, with the cross

13   collateralization six or $700,000.  But his exemption based

14   on now where we're at, I think would have been limited to

15   around $190,000 because of his fraud.

16   Q    Okay.

17   A    At -- at best.

18   Q    And, again, that -- at the time, though, he voluntarily

19   gave up about a million dollars in assets that at the time

20   he was not required to give up.  Is that fair?

21   A    Yes.

22   Q    Okay.  You -- you talked about moving assets and those

23   -- those types of things.  You talked about the -- the

24   recording.  To your knowledge, has Mr. Pettit been charged

25   with any obstruction?

1    A    Not to my knowledge.

2    Q    Okay.  Has he been charged with any type of tampering

3    with witnesses?

4    A    Not to my knowledge.

5    Q    Are you aware that he also in that same conversation

6    told -- that was his nanny's daughter?

7    A    Correct.  I believe so.

8    Q    Okay.  And are you aware that he told the nanny's

9    daughter in that same conversation not to lie?

10   A    I don't remember that.  I have to listen.  He may have

11   said that.

12   Q    Okay.  And, again, we -- we listened to a portion of it

13   but we didn't play the whole recording.  Is that right?

14   A    Correct.

15   Q    Okay.  And you -- you conditioned what you thought he

16   was trying to do.  You thought he was trying to witness

17   tamper.  Obviously, you don't know what was inside the mind

18   of Mr. Pettit at the time.

19   A    That's correct.  But I heard what I heard.

20   Q    And, again, you -- you said he was incarcerated for

21   contempt for approximately three months?

22   A    Correct.

23   Q    And then, subsequently, he was released when Judge

24   Gargotta -- did you use the term, "purge the contempt?"  Or

25   am I misusing that?

ERICK TERRY - CROSS

1   A    His lawyer argued a motion requesting Judge Gargotta to

2   release Mr. Pettit based on his purge of the contempt.  So,

3   I'm not so sure that mister -- that Judge Gargotta found a

4   complete purging but he released him, again, based on a

5   weighing the factors.  I don't believe he's purged himself

6   of the order that put him in contempt.

7   Q    And in part, that's based on the settlement and waiver

8   agreement that you reached with Mr. Pettit?

9   A    The only -- we had no condition of release in our

10  settlement agreement.  Our settlement agreement was not to

11  oppose his release.

12  Q    Okay.

13  A    So it was not a condition that he'd be released.

14  Q    So you -- because Mr. Pettit signed off on this

15  settlement agreement, you agreed basically to leave it

16  within the Court's discretion whether to release or detain

17  Mr. Pettit?

18  A    Correct.

19  Q    Okay.

20          MR. ALLEN:  Can I have one moment, Your Honor?

21          THE COURT:  Okay.

22          (Pause.)

23          MR. ALLEN:  Thank you, Your Honor.  I pass the

24  witness.

25          THE COURT:  Okay.

ERICK TERRY - CROSS

```
 1                 MR. STEPHENSON:  Your Honor, no further questions.
 2                 THE COURT:  Okay.  Then can this witness be excused
 3      for when the hearing resumes or does he need to be here --
 4      you're, of course, welcome to return.
 5                 MR. STEPHENSON:  He can be excused, Your Honor.
 6                 MR. ALLEN:  Yes, Your Honor.
 7                 THE COURT:  All right.
 8                 THE WITNESS:  Thank you, Your Honor.  I appreciate
 9      it.
10                 THE COURT:  All right.  We will take a recess.  Be
11      back at 1:30.  Okay.  Thank you.
12                 THE COURT SECURITY OFFICER:  All rise.
13                 (Recess.)
14                 (Court resumes.)
15                 THE COURT SECURITY OFFICER:  All rise.
16                 THE COURT:  You may be seated.  We are back on the
17      record.  I apologize for the delay.  We need the defendant I
18      suppose.  Let's go ahead and bring him in.  Okay.  Are you
19      ready to call your next witness?
20                 MR. ALMONTE:  Yes, Your Honor.  At this time the
21      government calls FBI Special Agent Thomas Sweat.
22                 THE DEPUTY CLERK:  Please raise your hand.
23                 Do you swear or affirm that the testimony which you
24      may give to the Court in this case now, shall be the truth,
25      the whole truth, and nothing but the truth?
```

THOMAS SWEAT - DIRECT

```
 1                 THE WITNESS:  Yes, ma'am.
 2                 THE DEPUTY CLERK:  Thank you.
 3              THOMAS SWEAT, GOVERNMENT WITNESS, SWORN
 4                        DIRECT EXAMINATION
 5    BY MR. ALMONTE:
 6    Q     Good afternoon, sir.  Will you please introduce
 7    yourself to the Court and for the record, please?
 8    A     Yes, sir.  I'm special agent Thomas Sweat of the San
 9    Antonio Division in the FBI.
10    Q     Okay.  The FBI is also known as the Federal Bureau of
11    Investigation?
12    A     Correct.
13    Q     Okay.  How long you been assigned to the San Antonio
14    FBI?
15    A     About a year and a half.
16    Q     And prior to that, what was your work experience?
17    A     Before that I ran a small business in the oilfield.
18    Q     Okay.  And what types of work would you do in relation
19    to that?
20    A     So I was the chief operating officer for most of my
21    time there, so accounting work, bookwork, fieldwork, the
22    whole -- the whole nine-yards.
23    Q     And do you currently hold any degrees, whether they be
24    undergraduate or graduate degrees?
25    A     I have an undergraduate degree in business and a law
```

THOMAS SWEAT - DIRECT

1   degree from SMU.

2   Q    Okay.  And you mentioned you have a law degree.  Are

3   you a licensed attorney?

4   A    Yes.

5   Q    Okay.  But currently not practicing law?

6   A    Correct.

7   Q    Okay.  So here as an agent not as lawyer?

8   A    That's right.

9   Q    That's probably the smart thing.  Let me ask you, you

10  said you've been with the FBI for about a year and a half.

11  What are your duties and responsibilities and your current

12  assignment?

13  A    So to investigate white collar crimes.

14  Q    And as part of the investigation, what -- generally,

15  what do you do in those investigations?

16  A    So my investigations involve conducting interviews and

17  during forensic account analysis.

18  Q    And did you have the occasion to be involved in an

19  investigation of Christopher John Pettit?

20  A    Yes.

21  Q    And do you know him also as Chris Pettit?

22  A    That's right.

23  Q    And what was your involvement in investigating Pettit?

24  A    So I came onto the case and then was instrumental in

25  coordinating a lot of the review of bank statements as well

THOMAS SWEAT - DIRECT

1    as conducting all the interviews of potential victims.

2    Q    And -- and -- and in analyzing or reviewing bank

3    statements, what -- what specific accounts were you focused

4    on?

5    A    So I'd say the primary accounts were an estate

6    management account designated as such with Frost Bank and

7    then New Mexico IOLTA account with Wells Fargo.

8    Q    And the New Mexico IOLTA account, did he -- beyond that

9    IOLTA account, did he have any other IOLTA accounts that

10   you're aware?

11   A    Yes.  I believe there was an IOLTA account with couple

12   of different banks.  And there was also a Texas IOLTA

13   account with Wells Fargo.

14   Q    In your analysis of those accounts, what -- what were

15   you focused on or what were you looking for?

16   A    So, I was looking for money that would come in from

17   alleged victims and then just trace that -- those funds to

18   what it would be -- he spent on.

19   Q    So, in other words, money coming in, and you want to

20   see where that money went out?

21   A    Yup.

22   Q    Okay.  If and through your -- I guess just back -- and

23   you said you came on to the investigation.  Are you aware of

24   approximately when the investigation was opened?

25   A    I believe the investigation was opened at the end of

THOMAS SWEAT - DIRECT

1    March in the beginning of April.

2    Q    Of this year?

3    A    Of this year.

4    Q    In 2022.

5    A    M-hm.

6    Q    Okay.  And in evaluating the financial -- when you're

7    conducting the financial analysis, are there specific

8    transactions you're looking for based on the victims you're

9    -- you're interviewing?

10   A    Yes.  So based on victim interviews, it seemed that

11   Mr. Pettit was engaged in 1031 exchanges.

12   Q    And what's a 1031 exchange?

13   A    So the 1031 exchange is an IRS transaction that enables

14   somebody to defer capital gains tax as long as they sell

15   qualifying property and use those funds to purchase a

16   qualifying property of like-kind within a certain time

17   frame.

18   Q    And, essentially, is it your understanding that Chris

19   Pettit would serve as a qualified intermediary?

20   A    Yes.

21   Q    Otherwise known as a QI?

22   A    Yup.

23   Q    Okay.  And as QI, what would Pettit instruct clients to

24   do with their money from the sale of an asset?

25   A    So he would often instruct clients or notify clients

THOMAS SWEAT - DIRECT

1  that he would send wiring instructions on their behalf to

2  the title company or the closing company and then have the

3  clients okay to have the title company wire the closing

4  funds to -- most of the time his IOLTA account, as an escrow

5  account, where he would hold the funds until such a time as

6  the client identified the qualifying property or they asked

7  for a distribution.

8  Q    And based on your analysis, was that money -- that

9  money from the 1031 exchange or was -- what was to be used

10 as a 1031 exchange, was that being held in escrow in

11 Pettit's IOLTA account?

12 A    um --

13 Q    Or any other accounts where it was deposited?

14 A    It was deposited in those accounts.  It was not held as

15 extra.

16 Q    Okay.  And what was that money being used for?

17 A    That money was being used to pay other clients to

18 purchase assets and to be distributed to other individuals

19 and to include Mr. Pettit himself.

20 Q    Was there any other significant purchases that you were

21 able to identify?

22 A    Purchases of real property.  So particularly a down

23 payment on a house in Florida and some other.

24 Q    And -- and you've heard -- you've heard reference to a

25 property in Florida.  It's maybe been referred to as a

THOMAS SWEAT - DIRECT

1    mansion at -- at Disney world.  Is that -- is that the same

2    property that's been discussed?

3    A    Yes.

4    Q    Okay.  And you said a down payment.  Approximately, how

5    much was that money or how much was that down payment?

6    A    My understanding is $800,000.

7    Q    Okay.  And that would of -- that would've come from a

8    1031 exchange deposit?

9    A    The funds from that are client funds.  Yeah.

10   Q    Okay.  And, overall, in your review of Pettit's, I

11   guess, conduct, you know he operates a law practice.  Is

12   that correct?

13   A    Yes.

14   Q    What type of services did he -- did he provide?

15   A    My understanding is that he himself provided estate

16   planning and investment services in addition to the 1031

17   exchange services through his law practice.  And I believe

18   there was also a personal injury side of his law practice.

19   Q    And, specifically, as to -- we discussed 1031

20   exchanges.  But as it relates to the estate planning, were

21   you able to identify other avenues or other aspects of fraud

22   as it related to that?

23   A    Yes.

24   Q    And what was that?

25   A    Those are instances where Mr. Pettit would take client

THOMAS SWEAT - DIRECT

1   funds under the ostracism of investing them in bonds and

2   then not invest them in bonds.

3   Q    And what -- what was the -- the -- I guess the

4   representation that Mr. Pettit, the defendant, would say to

5   clients as related to the bonds?

6   A    That their money would be safe and that it would be

7   invested in a high -- I believe it was a secondary market

8   bonds -- high interest, I'm sorry, high interest bonds.

9   Q    And did you do a specific analysis as to certain

10  deposits that were made for those bonds?

11  A    Yes.

12  Q    And once -- where were those funds deposited into?

13  A    They were deposited into several different accounts to

14  include the IOLTA account and the estate management account.

15  Q    You say several different accounts.  Are those accounts

16  controlled and owned by Chris Pettit?

17  A    Yes.

18  Q    Once that money is deposited, based on your analysis,

19  what were you able to determine?

20  A    I was able to determine that in many instances shortly

21  after the money was deposited, so sometimes the same day,

22  sometimes within a week, sometimes within a month, that

23  money was spent on anything but bonds and qualifying

24  properties for 1031 exchanges.

25  Q    You said he spent on anything but those -- those things

THOMAS SWEAT - DIRECT

1    you just described.  Was it spent on items not original --

2    not meant for its purpose or its original purpose?

3    A    That's correct.

4    Q    Beyond the -- the bonds and the 1031 exchanges, you

5    mentioned that he engaged in estate plannings.  Does that

6    include trust, irrevocable trust?

7    A    Yes.

8    Q    Did you do or focus your investigation or analysis on

9    that aspect as well?

10   A    Yes.

11   Q    And what were you able to determine?

12   A    I was able to determine that the money that was being

13   held in trust by Mr. Pettit was then used to purchase assets

14   to pay off other victims and to distribute to individuals in

15   -- in contradiction to the representations that he made to

16   the victims who he established the trust for.

17   Q    And some of the -- you mentioned some of the assets was

18   -- was real property.  Is that a fair statement?

19   A    Yes.

20   Q    What other assets were you able to -- to determine he

21   either purchased or was making payments towards?

22   A    A vehicle.  Purchase of -- payments made to car

23   dealerships, also real property, as you said.  And then

24   distributions to individuals.

25   Q    As far as payments made to real property, were you able

THOMAS SWEAT - DIRECT

1   to identify any more -- large mortgage payments that were

2   made to certain properties?

3   A    Yes.

4   Q    And -- can you identify those for the Court?

5   A    I believe they were mortgage payments made to Champions

6   Run property as well as to the property in Florida.

7   Q    And the Champions Run property, what do you know that

8   -- that property to be to Chris Pettit?

9   A    His home here in San Antonio.

10  Q    And were you able to identify, approximately, maybe not

11  a total, but certain payments.  How much they -- they were

12  for?

13  A    How much each mortgage payment was for?

14  Q    Right.

15  A    I don't recall the exact amount but they did appear to

16  be mortgage payments.

17  Q    Okay.  And -- and -- also during the course of your

18  investigation, what else are you focusing your financial

19  analysis on?

20  A    In terms of?

21  Q    As -- as far as tracing or following the money.

22  A    All right.  So we're just focused on when the money

23  came in and then on what it was being spent on, if it was

24  used to purchase any assets.  And that's -- that's pretty

25  much the extent of it.

THOMAS SWEAT - DIRECT

1    Q    Did you identify -- you see wire transfers going from
2    various accounts or to various purchases?  During the course
3    of your analysis were you able to find or determine whether
4    or not there was any cash withdrawals?
5    A    Yes.
6    Q    Okay.  And -- and can you describe the nature of those
7    cash withdrawals?
8    A    So this an ongoing investigation, but preliminary
9    analysis indicates that from one Wells Fargo IOLTA account
10   over the course of approximately April of 2021 to April of
11   2022 almost half a million dollars was taken out in -- in
12   branch withdrawals.
13   Q    Okay.
14   A    And then --
15   Q    And before we move on--
16   A    M-hm.
17   Q    -- to the next portion -- that five -- that almost five
18   to a half million or $500,000 was taken out of a New Mexico
19   IOLTA account.  Is that accurate?
20   A    Yes.  Yes.
21   Q    And have you been able to, I guess, identify where
22   those funds went, that $500,000?
23   A    Not at this time.
24   Q    Okay.  And beyond $500,000, I think I cut you off, you
25   were about to indicate maybe there's some other findings.

THOMAS SWEAT - DIRECT

1   Can you go ahead and do that, please?

2   A    From the Frost estate management account, there was in

3   the neighborhood over the course of about a year and a half

4   during the period covered by the indictment of almost a

5   million that was withdrawn in cash.

6   Q    And similar to the $500,000 you spoke with, have you

7   been able to identify where that -- that -- close to -- you

8   said a million dollars--

9   A    M-hm.

10  Q    -- in cash withdrawing has -- has gone?

11  A    No.

12  Q    So at this time it's still unaccounted for?

13  A    Correct.

14  Q    Okay.  On those cash withdrawals, were you able to --

15  are there any cash withdrawals -- do you see any other

16  transactions going to outside third parties that you might

17  -- known third parties to you now?

18  A    Yes.

19  Q    And -- and -- who are those -- I guess those transfers

20  going to that you've been able to identify?

21  A    What appeared to be close associates of Chris Pettit.

22  Q    Okay.  And so at least they got -- it could appear to

23  you that it's not a business relationship that you're aware

24  of?

25  A    Correct.

THOMAS SWEAT - DIRECT

1   Q     Okay.

2   A     Seems to be friendships, just close associates.  Yeah.

3   Q     And, approximately, describe that to the Court those

4   transactions account.  How many are there and the amount.

5   A     There's numerous amounts, and they range from anywhere

6   between a thousand dollar to approximately $5,000 regular

7   payments during periods of time to as much as $10,000 in one

8   instance, like one of those payments.  Sometimes they take

9   the form of wires.  Other times they're checks.

10  Q     Okay.  And you had mentioned earlier that the -- I

11  think you said that the -- the investigation is ongoing.  Is

12  that still accurate?

13  A     Yes.

14  Q     So does it -- what does that mean it's ongoing?

15  A     That means that every week almost we identify a -- new

16  potential victims, and we get further and further into

17  seeing where victim funds have been used and

18  misappropriated.

19  Q     And you had -- you testified that some of the funds

20  that you identified from one victim deposited would then be

21  paid to another victim.  Is that -- is that accurate?

22  A     Yes.

23  Q     And based on your training and experience, what does

24  akin to?  What is that similar to that you have seen?

25  A     It seems to me that it was a pretty prototypical Ponzi

THOMAS SWEAT - DIRECT

1  scheme.

2  Q    And although the investigation is still ongoing and its

3  preliminary findings, do you have a -- as you sit here

4  today, at least an estimated amount of loss that you've

5  identified, even if it's a conservative amount?

6  A    Yes.  On the conservative side I would say $30 million

7  during the time period that we've been investigating, and it

8  could be as high as 70 million or more.

9  Q    And -- and agent -- Agent Pettit is moving to a

10 different -- I'm sorry, Agent Sweat, not agent Pettit, I

11 apologize.  Agent Sweat, moving to a different topic, are

12 you familiar with the bankruptcy proceedings involving Chris

13 Pettit?

14 A    Yes, I am.

15 Q    Okay.  And how are you familiar with those proceedings?

16 A    I've attended a few of them in person.  And then also

17 via a call-in, and then I've -- I've spoken with the

18 trustee.

19 Q    Okay.  And as a result of the bankruptcy proceedings,

20 are you aware of any specific allegations that were provided

21 to you or the U.S Attorney's office reference misconducts by

22 Chris Pettit?

23 A    Yes.

24 Q    Okay.  What is the nature of those allegations or the

25 complaint that was provided?

THOMAS SWEAT - DIRECT

1  A     The nature of those allegations are allegations of

2  lying under oath, of generally obstructing the process of

3  the bankruptcy, and of trying to influence witnesses.

4  Q     And the lying under oath, are you -- are you familiar

5  with the specifics of what that entails?

6  A     Yes, I believe so.

7  Q     Okay.  And can you describe that for the Court, please?

8  A     So my understanding is that Mr. Pettit has claimed to

9  not know where certain property is, specifically a business

10 laptop, and claim to have never had it even though I've been

11 seeking to introduce to show that it was sent to him and

12 that he did in fact have it at one point.

13 Q     And during the pendency of the bankruptcy proceeding,

14 are you familiar with kind of -- did the bankruptcy

15 proceeding commence around June of this year.  Is that -- is

16 that -- would that be accurate?

17 A     I believe so, yes.

18 Q     Okay.  Are you familiar with any other transactions

19 that Chris Pettit would of engaged in as it relates to your

20 investigation?

21 A     Yes.  I have reason to believe that Christopher Pettit

22 was engaging in the same types of transactions that we're

23 investigating, soliciting funds for investment or other

24 like-kind transactions, pretty much up into filing a

25 bankruptcy.

THOMAS SWEAT - DIRECT

1   Q    Okay.  When you say up to filing bankruptcy, around
2   when would -- did that occur?
3   A    So we know of transactions in April.  So two months
4   before and potentially in May as well.
5   Q    Okay.  And the transaction in April, what is that
6   transaction?  Are you familiar with it?
7   A    Yeah.  There was a large 1031 exchange that was done in
8   April, towards the end of April.
9   Q    And -- and what was that amount for?
10  A    Almost -- like what it was the amount?
11  Q    Right.
12  A    Almost $3 million.
13  Q    Okay.  And are you familiar with whether or not Chris
14  Pettit at any point became aware or familiar with the
15  federal investigation into him?
16  A    Yes.
17  Q    Okay.  And -- and how are you aware of that?
18  A    He reached out to our office through his attorney.
19  Q    Okay.  And approximately when did that occur?
20  A    Around Easter.
21  Q    Okay.  So that would have been in April of 2022?
22  A    M-hm.
23  Q    So just -- just backtracking just a little bit, we have
24  April of 2022.  You guys get contacted by a lawyer
25  representing Chris Pettit.  Fast forward to May.  There's --

THOMAS SWEAT - DIRECT

1    you mentioned potentially another transaction.  What was

2    that transaction?

3    A    I believe it was another 1031 exchange.

4    Q    Okay.  So at that point Mr. Pettit is still taking in

5    client funds?

6    A    Yes.

7    Q    Okay.  Do you know the status of those funds from the

8    May transaction?

9    A    Um, I don't.  I believe they've been spent.

10   Q    They've been what?

11   A    Spent.

12   Q    Okay.

13   A    And not on the -- the proposed place they should be

14   spent.

15   Q    And specific to -- we heard testimony earlier regarding

16   a Martha's Vineyard account, are you familiar with that?

17   A    Yes.

18   Q    Okay.  And have you been able to -- I think the

19   testimony was that a lot of the money went into that account

20   from a 401K or similar type retirement account.  Are you

21   familiar with that testimony?

22   A    Yes.

23   Q    Were you able to identify other sources of funds into

24   that account?

25   A    Yes.

Q And what were you able to, based on your analysis, what were you able to see or view?
A I was able to identify some client funds that went into the account as recent as April.
Q Okay. And fast forward, just for the Court's recollection, what was done with some of those funds that you saw during the pendency of the bankruptcy proceedings?
A As Mr. Terry I believe spoke on, they were spent on personal expenses by Mr. Pettit.
Q So it's -- it's -- as -- as you sit here today, Martha's Vineyard account is -- is not in total just I -- 401K money -- retirement money?
A Yes. That's my understanding is that it was -- there were multiple sources of funds sent to that account.
Q Okay. Approximately how many victims have you identified, if -- if you had to guess?
A Approximately --
(Cross-talking.)
Q But don't guess. Approximately, what's your best conservative -- I apologize.
A Approximately 60 victims.
Q Okay. And they all fall in the same parameters as we discussed as far as the scheme?
A Yes. Either investment, the establishment of a trust, or 1031 exchanges. That pretty much covers most of it.

THOMAS SWEAT - CROSS

```
1    Q    Okay.  And have you been, during the course of the

2    investigation, is it also your role to identify assets?

3    A    Yes.

4    Q    Okay.  And did you view or look at any of the

5    bankruptcy schedules?  Or were you aware of the schedules

6    filed within the bankruptcy court?

7    A    Yes, I was aware of the schedules.  Yes.

8    Q    Okay.  And what -- what was your understanding of the

9    accuracy of those schedules filed by Chris Pettit?

10   A    My understanding is that they were not accurate, which

11   was at least part of what precipitated the contempt

12   proceedings and -- and that there was a lot of issues with

13   finalizing those schedules.

14             MR. ALMONTE:  No further questions, Your Honor.

15   Pass the witness.

16                      CROSS-EXAMINATION

17   BY MR. ALLEN:

18   Q    Good afternoon, Agent Sweat.

19   A    Afternoon.

20   Q    Okay.  So you reviewed bank statements and everything,

21   and then you -- you contact or you are contacted by a

22   potential victim.  Is that accurate?

23   A    That's accurate.

24   Q    And you said new potential victims because you have to

25   flush out whether they actually are victims or they're
```

THOMAS SWEAT - CROSS

1    trying to -- to jump on and say that they are.  You have to

2    confirm that.  Is that right?

3    A    That's right.

4    Q    Okay.  And so you would know the victims as far as the

5    ones that you've confirmed.  You get their information as

6    far as names and addresses and phone numbers?

7    A    Yes.

8    Q    Okay.  Now, you talked about -- your investigation

9    started in March or April of 2022?

10   A    M-hm.

11   Q    And you said Mr. Pettit was aware of the investigation

12   in April of 2022; is that right?

13   A    That's my understanding.  Yes.

14   Q    And he still, as far as you know, would still come when

15   ordered to -- to the bankruptcy proceedings and -- and come

16   to San Antonio Texas.  Right?

17   A    Uh, he would often not come to San Antonio Texas.  No.

18   Q    To the bankruptcy proceedings?

19   A    He would appear, as far as I know, to the bankruptcy

20   proceedings but most of the time virtually.

21   Q    Okay.

22   A    From the ones that I attended.

23   Q    Okay.  But, again, those would be after he was aware

24   that there was some investigation going on.  Right?

25   A    Yes.

THOMAS SWEAT - CROSS

1   Q    Now, you talked about cash withdrawals, and you're
2   still trying to figure out where some of that money went?
3   A    Yes, sir.
4   Q    Have you -- you -- you haven't been at all of the
5   bankruptcy proceedings, is that fair to say?
6   A    That's fair to say.
7   Q    So you're not aware if Mr. Pettit, either himself or
8   through his attorney, has -- has tried to explain where some
9   of those cash assets went?
10  A    I'm generally aware of what the -- the explanations
11  have been for where the money went.
12  Q    Okay.  So there -- there has been some explanations?
13  A    Yes.
14  Q    Okay.
15  A    None of them yet to dissuade our investigation.
16  Q    Now, the -- you estimated conservatively about
17  30 million but as high as 70 million; is that right?
18  A    Yes.
19  Q    And, again, the -- just like you're identifying victims
20  to make sure that they're actual victims, the bankruptcy
21  courts -- the creditors, they're doing the same to make sure
22  that those creditors are real creditors and not just people
23  trying to get money?
24  A    The identification of victims in a criminal case and
25  the identification of creditors in a bankruptcy case, they

THOMAS SWEAT - CROSS

1   are very different.  But were both active and ongoing, yeah.

2   Q    And were you present at the bankruptcy proceeding of

3   December I believe 7th of 2022?

4   A    December 7th 2022?  The most recent one?

5   Q    Yes.

6   A    Yes.

7   Q    Okay.

8   A    For part of it.

9   Q    Okay.  So you weren't there for the entire hearing?

10  A    I was not.

11  Q    I guess would the audio of the hearing be the best

12  evidence of that, what took place at that hearing?

13  A    I believe it would be.

14  Q    Now, you talked about some allegations or complaints

15  that came to you or your office and one of those was you

16  said lying under oath; is that right?

17  A    Yes.

18  Q    To your knowledge, Mr. Pettit hasn't been charged with

19  that, has he?

20  A    No.

21  Q    Obstructing.  You said the process or influencing

22  witnesses.

23  A    Yes.

24  Q    And has he been charged with that?

25  A    No.

THOMAS SWEAT - CROSS

1   Q    Okay.  Now, the investigation was happening as far back

2   as possibly April of 2022, right?

3   A    Yes.

4   Q    And you're aware that an -- an indictment didn't come

5   out until just a few days ago--

6   A    That's correct.

7   Q    -- when Mr. Pettit was scheduled to be released from

8   the contempt hearing.

9   A    M-hm.

10  Q    And you talk about -- obviously, the investigation is

11  still ongoing, correct?

12  A    Correct.

13  Q    And you use terms like, well, I believe he spent that

14  money on other things, I believe this happened.  That's

15  because you're still in the process of confirming or denying

16  all of those allegations.  Is that fair?

17  A    It's fair in total of that I'm sure of what he's spent

18  the money that I've investigated on.

19  Q    Okay.  And as far as the -- the bankruptcy proceedings,

20  you're aware that at that last hearing Mr. Pettit

21  voluntarily gave up his homestead and retirements --

22  retirement accounts?

23  A    After being held in custody for contempt.  Yes, sir, he

24  voluntarily did that.

25  Q    So that's a yes, correct?

THOMAS SWEAT - CROSS

1    A    That's a yes.

2    Q    Okay.  And are you aware of that there's hundreds of

3    thousands of emails that the trustee and bankruptcy

4    attorneys needed Mr. Pettit to go through to verify

5    creditors?

6    A    Yes.

7    Q    Are you aware that he has already surrendered his

8    passport?

9    A    Yes.

10   Q    And just to be clear, there's no allegations of any

11   violence or guns or anything in the case.  Is that fair?

12   A    I believe that's fair.

13   Q    Okay.

14           MR. ALLEN:  One moment, Your Honor.  I'll pass the

15   witness.

16           THE COURT:  Okay.  Any redirect?

17           MR. ALMONTE:  No, Your Honor.  Nothing further.

18           THE COURT:  All right.  Thank you.  You may step

19   down.  Will the government be presenting any more witnesses

20   or just relying on what's been already presented plus the

21   pretrial report.

22           MR. ALMONTE:  That's correct, Your Honor.  No -- no

23   further witness.  We are relying on what's been presented.

24           THE COURT:  Okay.  All right.  So are you going to

25   call any witnesses?

THOMAS SWEAT - CROSS

1           MR. ALLEN:  No witnesses, Your Honor.  We do have a
2    -- a proffer as -- as far as the recording from the
3    bankruptcy proceeding from the -- the clerk of that court.
4    We'd like to play just two portions of it for -- for the
5    Court.
6           THE COURT:  Okay.  Any objections?
7           MR. ALMONTE:  No objections, Your Honor.  I haven't
8    heard it yet.  But we have no objection.
9           THE COURT:  All right.
10          MR. ALLEN:  Was this made for -- received it from
11   the Clerk of the Court.
12          THE COURT:  It's the official court record.
13          MR. ALLEN:  Correct, Your Honor.
14          THE COURT:  Okay.
15          MR. ALLEN:  Correct, Your Honor.
16          THE COURT:  You may play it.
17          MR. ALLEN:  Okay.
18          (Audio playing.)
19          (Audio Paused.)
20          MR. ALLEN:  That's that first section and the
21   second -- second section --
22          MR. ALMONTE:  And, Your Honor, I don't mean to
23   interrupt but maybe I'm completely wrong.  I don't know if
24   maybe muting the mics might help with the echo issue.
25          THE COURT:  Oh.

THOMAS SWEAT - CROSS

```
 1              MR. ALMONTE:  If that's possible.
 2              THE COURT:  Okay.  I was able to understand Judge
 3    Gargotta.  But it might help a little bit muting just the
 4    mics next to wherever it's been --
 5              MR. ALMONTE:  I think -- I don't know if we can do
 6    it because I think there's speakers up here that --
 7              THE COURT:  Ahh.
 8              MR. ALMONTE:  That's catching.
 9              THE COURT:  Ms. Sandoval, you want to try that.
10              MR. ALMONTE:  And that may be completely off base
11    but --
12              MR. ALLEN:  Just so the Court knows, it's not
13    actually on the -- the recording  doesn't have all the --
14    (unclear.)
15              THE COURT:  We have an echo.
16              THE DEPUTY CLERK:  We may be there but I would --
17    ultimately, I don't know where it's coming from.
18              THE COURT:  Well, I was able to understand it.  So
19    as long as you all are as well -- I think we can get through.
20              MR. ALMONTE:  Right.
21              THE COURT:  It's not much longer is it?
22              MR. ALLEN:  About 12 minutes, Judge.
23              THE COURT:  12 minutes?
24              MR. ALLEN:  Maybe about ten minutes, Judge.
25              THE COURT:  Okay.  All right.  We'll see how it
```

THOMAS SWEAT - CROSS

1   goes.

2           MR. ALLEN:  Your Honor?  I -- I apologize.

3   Mr. Smeberg was present at the hearing.

4           THE COURT:  Okay.

5           MR. ALLEN:  I can -- if the Court will allow it, I

6   think he can proffer to what the ten minutes would say and

7   probably condense it down.

8           MR. ALMONTE:  I don't have an objection to that --

9   to that, Your Honor.  I guess it's my only concern is

10  Mr. Smeberg as well, if he's going to be a --

11          THE COURT:  Is he a witness or a lawyer?

12          MR. ALMONTE:  Right.

13          MR. ALLEN:  Right.  For the purposes of the

14  hearing, he's just a lawyer that's proffering what--

15          THE COURT:  Okay.

16          MR. ALLEN:  -- what would be on the recording.

17          THE COURT:  But it is a detention hearing.  So I

18  think --

19          MR. ALMONTE:  Right.

20          THE COURT:  We'll take it as a--

21          MR. ALMONTE:  No.  That's fine.

22          THE COURT:  So I think we'll take it as a proffer.

23          MR. ALMONTE:  I just didn't want it down the road

24  having issues that he was a witness.

25          THE COURT:  Okay.  Go ahead.

THOMAS SWEAT - CROSS

1             MR. ALLEN:  Right.

2             MR. SMEBERG:  Thank you, Your Honor.

3             Ron Smeberg.  Some of the main things that came out

4     I won't be able to get all perfect but I'll do the best I

5     can, Your Honor.

6             It was stated numerous -- Patrick Husticker is the

7     primary lawyer for the trustees office.  And he's told the

8     Court numerous times that it was important for the debtor, I

9     call the debtor Mr. Pettit, to be available for -- for him to

10    work with -- for him to work with the trustee on a regular

11    basis to help them work through the issues with the case.

12            One thing the Court heard from the -- from the

13    detective was there was hundreds of thousands of emails.

14    There's a lot of information that needs to be gone through,

15    and he probably said three or four times -- the counsel told

16    the Court that if Mr. Pettit was to be allowed, their primary

17    concern was that he was available to work with the trustee on

18    all the different issues in this case.

19            There's been a lot of litigation.  The Court

20    alluded to that in the last portion we heard.  He also went

21    to long length -- I'm not trying to pat myself on the back

22    but he went to a long part of -- he talked about thanking me

23    for being a part of the case.  He talked about prior cases I

24    worked on with the Court, and he -- he mentioned how he

25    thought that the debtor had shown -- there had been a

THOMAS SWEAT - CROSS

1    rehabilitative affect on the debtor by what had happened in

2    the case in the last four weeks.

3            Up to the point where I came in the case, I would

4    describe the bankruptcy as a -- a train wreck.  And I say

5    that -- I don't say that lightly.  The debtor was

6    obstructive, and he was not cooperative, and things did not

7    -- were not done the way they should have been done.

8            And one of the things the Court went to great

9    lengths to do was to mention how in the last four weeks

10   things have changed.  The debtor has been cooperative.  How

11   obviously this big term on this settlement that we worked out

12   with the trustee was a really big deal for the case.

13           And -- and so -- the impression I got from the

14   Court -- and, again, and I invite to Court to listen to it

15   offline if the Court wants to.  But it may give you

16   indication that he saw light at the end of the tunnel as far

17   as us working through the issues in this case.

18           And so when I took the case, originally, I was

19   trying to become the creditors committee lawyer four or five

20   months ago.  That didn't happen.  And so when I took this

21   case, I told the Court -- in fact, I told the Court at this

22   same hearing.  I told the Court that our -- my goal here was

23   to make it better.  I wasn't going to make white picket

24   fences, zebras, and butterflies.  But I believe that working

25   with the debtor we can turn things around and show -- and

THOMAS SWEAT - CROSS

1   bring evidence to the Court and help make things better for

2   the creditors, which I believe makes things better for

3   Mr. Pettit.

4           I believe there -- in -- in a way their interest is

5   out line because if he can help bring money into the estate,

6   if he can help clarify -- you know, there's $260 million of

7   claims, and they've identified 30 to 70 million that are

8   real.

9           What often happens in these cases is kind of like a

10  hurricane.  A hurricane goes through, then all the looters go

11  through.  So you kind of get hit twice.  You get hit by a

12  hurricane.  Then you get hit by people trying to rip

13  everything off.

14          Same thing happens in big bankruptcy where there's

15  not a lot of information.  What happens is you have a lot of

16  creditors.  They see an advantage here, and they file a bunch

17  of claims or excessive claims.

18          And really the only person, in my opinion, that's

19  available to help to go through that is Mr. Pettit.  And so I

20  believe that working together -- I'm going through these

21  hundreds of thousands of emails, researches, that we'll be

22  able to bring value into the estate.  And so -- and, again,

23  I'm not giving a very good -- I'm trying not to put words in

24  -- in Judge Gargotta's mouth.  I have all respect in the

25  world for him.

THOMAS SWEAT - CROSS

1          But he did say that he trusted me to do that.  And

2     I -- he specifically used the word trust.  And I think that's

3     about it.  Okay.  Yes, Your Honor.

4               THE COURT:  Okay.  All right.  Thank you.

5               MR. ALLEN:  We have a second proffer.  It's also

6     from -- it was filed in the bankruptcy case.  It's the

7     disclosure of compensation for Mr. Smeberg along with the

8     affidavit that we would proffer to the Court.

9               THE COURT:  Okay.

10              MR. ALLEN:  The -- the last is just a proffer that

11    the same individual, the affidavit there, Theodore Formeia

12    proffered that he would be willing to put up any collateral

13    he has via a third-party custodian.

14              He does live in Florida, though.  But also helps

15    secure an apartment or housing here in San Antonio.  And that

16    would be all that the -- all that we have other than

17    argument, Your Honor.

18              THE COURT:  Okay.  All right.  And I -- we do have

19    the pretrial services report, which you both have.  And I

20    don't know that anybody has any corrections or comments or

21    anything on what's contained in there that you can address,

22    obviously, the substance of it in your argument.  But any --

23    anything that you would object to or that request.

24              UNKOWN SPEAKER:  I've got it but I can barely hear

25    it.

THOMAS SWEAT - CROSS

```
 1                THE COURT:  You could of -- requires a connection.
 2     I'm not sure where that came from.
 3                (Laughter.)
 4                MR. ALLEN:  I thought it was Judge Gargotta.
 5                THE COURT:  Oh, that was Judge Gargotta?  Okay.  Do
 6     you have anything else on the pretrial?
 7                MR. ALMONTE:  Not by way of witnesses, Your Honor.
 8                THE COURT:  And the pretrial report, nothing from
 9     you?
10                MR. ALLEN:  No, Your Honor.
11                MR. ALMONTE:  Nothing on the pretrial.
12                THE COURT:  All right.  Then I will hear argument.
13                MR. ALMONTE:  Yes, Your Honor.
14                THE COURT:  You may begin.
15                MR. ALMONTE:  May it please the Court?
16                THE COURT:  Yes.
17                MR. ALMONTE:  Your Honor, this Court's heard a lot
18     of testimony today and a lot of evidence presented to you.
19     Just kind of going most recent in time -- I know it was
20     proffered specifically that Theodore Formeia would be willing
21     to put up any kind of collateral or assets.
22                I just want to submit to the Court that that
23     individual is one of the individuals that Agent Tom Sweat,
24     when he identified specific individuals, close friends, or
25     associates receiving funds of money from client money, that
```

THOMAS SWEAT - CROSS

1   would be one of the individuals that money was sent to.

2          So I'd questioned as to his ability to even prior

3   to claim funds on behalf of Pettit's behalf.

4          But going into detention, Your Honor.  It is the

5   government's position that there -- there -- there's nothing

6   that this Court can do to reasonably assure that the -- not

7   only the appearance of Mr. Pettit, but more specifically I --

8   I think it's -- it's two facets.  We've got a -- a safety

9   issue with anger issue.

10          And you've also got the underlying obstruction of

11   justice that -- that has gone on during the pendency of our

12   investigation.  During the --

13          THE COURT:  And that's the part that I think is

14   most -- anyway, well, obviously had other cases that involve

15   fraud and--

16          MR. ALMONTE:  Right.

17          THE COURT:  -- and schemes like this, and there are

18   often conditions that can be fashioned that sort of remove

19   the individual from the ability--

20          MR. ALMONTE:  Sure.

21          THE COURT:  -- to engage in similar behavior and--

22          MR. ALMONTE:  Right.

23          THE COURT:  -- restrictions on their ability to

24   engage in certain financial transactions.

25          MR. ALMONTE:  Right.

THOMAS SWEAT - CROSS

1        THE COURT:  And those sorts of things.  But here
2    are the most compelling testimony, I guess for your side, was
3    the first -- the first witness.  And -- and everything that's
4    happened sort of -- during the bankruptcy--
5        MR. ALMONTE:  Right.
6        THE COURT:  -- and the attempts to just continue on
7    with surreptitious and dishonest and fraudulent behavior
8    successfully, apparently.
9        MR. ALMONTE:  Right.
10       THE COURT:  And so that's -- that's what I am most
11   concerned about.  And I think their sort of response to that
12   seems to be, well, there's been a shift though.  I mean,
13   Judge Gargotta did put him in jail from -- held him in
14   contempt, and that it had the desired affect.  It's what
15   they're arguing that he's now being cooperative.  That he's
16   secured a lawyer who's, you know, working to be -- to
17   cooperate with the trustee, and I -- and everything else.
18       So, in order to recover money on behalf of victims,
19   it's going to be, I guess, better if he's on the outside
20   assisting and all of that.  So, I'll just tee that up for you
21   to respond to.
22       MR. ALMONTE:  Okay.  Your -- Your Honor, I -- I
23   agree with your assessment on -- on the troubling aspect of
24   his continued fraud and his obstruction during the pendency
25   of the bankruptcy.  That was alarming for the government as

THOMAS SWEAT - CROSS

1   well.

2            I -- I do think that Mr. Pettit -- although I -- I

3   don't necessarily agree with the assessment that he's now

4   become fully cooperative.  That's part of the Court order

5   from the bankruptcy that he has to be fully cooperative.

6            He became cooperative after being held in contempt

7   and sat in jail for three months.

8            THE COURT:  That is the point.

9            MR. ALMONTE:  That is the point.  That's -- that's

10  the wake-up call.  But, you know, I don't -- I don't think he

11  ever fully purged himself of that contempt because there's

12  still unknown questions that -- questions that have not been

13  answered.

14           But -- but it became to the point where, you know,

15  Judge Gargotta had to do that -- that balancing question of

16  -- of how long can I keep somebody in civil contempt before

17  it becomes criminal.

18           I think he -- he did that analysis.  I -- I think

19  that's part of the record, and that's ultimately why he was

20  released.  I think, in part, it certainly I'd be -- you know,

21  I have to recognize and acknowledge, you know, in part, his

22  -- his agreeing to give up those assets or relinquish his

23  rights certainly helped his cause in getting out.

24           But what's concerning is it's not just the

25  continued fraud, it's the witness tampering.  Calling

THOMAS SWEAT - CROSS

1    witnesses, telling them to say certain things.  I -- I think

2    we -- there's a real fear that he'll continue to do that.

3         But -- but part of what -- for the Court's

4    consideration, is there's also a significant amount of money

5    that Agent Sweat testified to that -- that's just missing.

6         It's $1.5 million in cash withdrawals that we don't

7    know where it's at.  What he will do with those funds, if

8    he'll continue to obstruct our investigation by moving those

9    funds around and not let us get to those funds that we're

10   trying to search for is a real concern for the government.

11        I think as, Your Honor, had indicated before, you

12   -- you've seen numerous white collar, wire-fraud, fraud type

13   cases before this court.  Often there are circumstances and

14   parameters and restrictions you can put on a defendant to

15   prevent this.  I did white collar cases before and this is

16   one that it shocks the conscious, his behavior post-knowing

17   there's -- there's an investigation, and during the

18   bankruptcy proceedings.

19        The trustee Eric Terry said he's never seen

20   anything like that.  I don't think there's any real

21   indication that he's not going to continue with his fraud.

22        He's -- I think he's flippant in his behavior,

23   hasn't acknowledged or accepted responsibility.  And he -- I

24   think he has the resources to continue to obstruct or not be

25   cooperative.

THOMAS SWEAT - CROSS

1           I do think this Court, as far as I understand the

2    argument, that he needs to be out in order to assist that --

3    the trustee.  I think there's two separate considerations,

4    obviously, two separate venues here.  You know, I think there

5    are parameters -- when we talk about emails, certainly it

6    would make it difficult probably to have him -- having to --

7    you know, whoever -- I guess, Mr. Smeberg go to jail and

8    review those emails.

9           But I think there are -- there are mechanisms.

10   Defendants in jail all the time review discovery and assist

11   their lawyers in preparation.  I don't think it's any

12   different here.  And so for those reasons, that's how I would

13   kind of distinguish or separate and hopefully alleviate,

14   maybe not, the Court's concern about helping the  creditors.

15          But I think that's a different consideration.  I

16   think -- I think the more bigger concern or the bigger

17   concern is the obstruction of justice that -- that he's done.

18   That he's continued to do and that I believe he will -- he

19   will do in the future.

20          THE COURT:  Okay.  Thank you.

21          MR. ALMONTE:  Thank you, Judge.

22          MR. ALLEN:  Just based on the Court's comments,

23   I'll try to limit to -- to the Court's concerns here -- here

24   on obstruction.  I'd point out that Mr. Terry was one -- one

25   of the individuals involved in reaching that agreement just

THOMAS SWEAT - CROSS

1    last week in the bankruptcy case and presented that to the

2    Court for the Court's permission to -- to try to handle that.

3            I understand we are talking about two different

4    things here.  The bankruptcy proceeding --

5            THE COURT:  Well, yes.  And the decision to

6    continue to detain someone pursuant to a contempt order is

7    obviously an entirely different analysis from the question of

8    whether or not the government's met their burden on the Bail

9    Reform Act.

10           MR. ALLEN:  Correct, Judge.  And so -- I -- but

11   some of the -- those same issues were brought up during the

12   contempt.  Was he obstructing?  Was he tampering with

13   witnesses?  Was he not -- was he being obstructive to that

14   investigation?  And part of the reasoning, I believe, was

15   Judge Gargotta found that, okay, well, there has been a shift

16   since Mr. Smeberg came on.  And then the order presented

17   that.

18           The giving up assets that the government is

19   concerned that he has these assets, assets that he did not

20   have to give up, he did in over a million dollars.  And his

21   homestead, which is why he doesn't have a residence anymore,

22   and his IRA account.

23           He also -- as the pretrial services report notates,

24   he surrendered his law license on May 24th of 2022.  So he

25   can no longer -- presumably, he can no longer do those types

CASE 5:22-cr-00653-OLG   Document 56-1   Filed 02/20/24   Page 70 of 74

THOMAS SWEAT - CROSS

1    of transactions.  He can't have an IOLTA account.

2              Again, so that would be something different than

3    when they -- when Agent Sweat was testifying things that were

4    happening in April, that was prior to his surrender of his

5    law license.

6              The -- if the Court wants to listen at the -- at

7    the end, Judge Gargotta does purge the contempt proceedings.

8    But, again, the -- the government goes into assets of 1.5

9    million, which Agent Sweat said he did determine at least

10   some of it where it was spent.

11             I think we heard testimony on -- on Amazon and

12   other -- other things.  There's also testimony that either

13   Mr. Pettit himself or the attorney for Mr. Pettit at the time

14   disclosed to -- in the bankruptcy court where those assets

15   have gone.

16             I understand Agent Sweat wasn't satisfied by that.

17   But that is in there.  So, again, as far as witness

18   tampering, you know, no contact orders, agent -- Agent Sweat

19   has apparently all of the information for at least their five

20   alleged victims in the case.  Obviously, that can be a

21   condition of the Court.

22             You know, as far as the other worries or concerns,

23   he's already given up his passport.  He can report in person,

24   he can have a GPS monitor.  They -- the pretrial services is

25   recommending him to go to a halfway house first, which we

1   understand I think it's partly because of the -- the mental

2   health concern.

3           And, in the meantime --

4           THE COURT:  Well, also he doesn't have another

5   residence.

6           MR. ALLEN:  Correct.  And, in the meantime, I'm

7   pretty confident that we'll be able to -- to secure an

8   apartment or some housing obviously with the approval of

9   pretrial services ahead of time that we can get to them.

10          It states in the report there's no known community

11  safety concerns.  So, again, I think that there is a set of

12  conditions that this Court can put on Mr. Pettit to ensure

13  that he follows not only Judge Gargotta's orders and the

14  orders that were just signed, but this Court's orders in not

15  participating or giving any sort of appearance of impropriety

16  of contacting any potential witness in the case for any

17  nature even if he tells them, just tell the truth, whatever

18  the case may be.  This Court can order, obviously, no contact

19  with anyone associated.  And the government can give a list

20  of -- of those individuals as well.

21          So we would ask that -- that Mr. Pettit be released

22  on a set of circumstances and conditions that the Court feels

23  appropriate to protect the community and also assure his

24  appearance in court.

25          THE COURT:  Okay.  Well, this is not a typical

THOMAS SWEAT - CROSS

1    case, and I -- and base -- I know that we have pretrial's

2    report, and we have pretrial's recommendation of detention.

3          But, of course, in this case pretrials not acting

4    based on any information related to the charged offenses or

5    anything that was proffered here today.  That's -- that's

6    really what goes to the, I guess, the dangerousness and the

7    obstruction risks that are present in this case that make it

8    different from -- from other types of cases as I mentioned.

9          And, I think, the sort of joint concerns that I

10   have include just for Judge Gargotta to have gotten to the

11   point to have entered multiple contempt orders and to

12   actually order incarceration would have been, as the

13   testimony suggested, on a record of extremely problematic

14   behavior in terms of following Court orders, complying with

15   obligations, doing what's supposed to be done, and acting in

16   a way that, as I mentioned before, is surreptitious,

17   dishonest, and continued to behave that way throughout the

18   proceedings when in an effort to -- to continue to acquire

19   assets, to attempt to influence witnesses.

20         This pattern of behavior against the backdrop of

21   the scope of the actual underlying charged offenses and what

22   was involved, the number of victims involved, the amount of

23   money involved, the unaccounted for money that is out there,

24   the fact that he has very -- he doesn't have a place to work

25   right now, he doesn't have to live right now.  And it -- all

THOMAS SWEAT - CROSS

1   of that together can suggest that detention is what is

2   appropriate in this case.  And the government has met its

3   burdens here.

4          I will order detention, and we'll take a brief

5   recess before my next proceeding.  Thank you.

6          THE COURT SECURITY OFFICER:  All rise.

7          (Adjournment.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THOMAS SWEAT - CROSS

1    UNITED STATES DISTRICT COURT   )

2    WESTERN DISTRICT OF TEXAS      )

3              I certify that the foregoing is a correct

4    transcript from the AUDIO RECORDING of proceedings in the

5    above-entitled matter.

6              I further certify that the transcript fees and

7    format comply with those prescribed by the Court and the

8    Judicial Conference of the United States.

9              Date signed:    December 3rd, 2023.

10

11                         /s/ Leticia Lucia Ornelas
                           United States Court Reporter
                           262 West Nueva Street, Room 1-400
12                         San Antonio, Texas 78207
                           (210) 244-5039

13

14

15

16

17

18

19

20

21

22

23

24

25